Morning. We have four appeals that are scheduled for oral argument this morning. The first is the United States of America v. John Holland and others. John Alex Romano is here for the more. And Mr. Romano, are you ready to proceed? Mr. Romano District Court will now to admit a co-conspirator's statements on the grounds that the government's proffered evidence failed to prove a conspiracy to violate the anti-kickback statute. That really was a piece of discretion because it was based on clearly erroneous fact findings and errors of law. But I would like to begin with the issue that this court raised in its first hearing. In its pre-argument letter to counsel, which cited a line of authority, the agreement in question need not be criminal in nature because the exception for co-conspirator statements encompasses statements made in furtherance of a joint venture, joint undertaking that has a lawful objective. And there are two points the government wants to make first. Based on our review of the relevant law, it does in fact appear to be the law of this circuit that the agreement in question need not be criminal in nature. And that's because the former Fifth Circuit applied that principle in the postal decision in the course of rejecting a jurisdictional challenge to the convictions, which were for conspiring to import marijuana. In a footnote? It did, Your Honor, but we do view that footnote as important to this decision. And certainly, you know, I think it's instructive that in 2011, the Fifth Circuit applied postal. For purposes of its law, it viewed the postal decision as binding precedent. Well, the district court here followed our decision in the United States versus how, I think that's how you pronounce it, H-O-U-G-H, right? And so, I mean, did the government challenge the district court's definition of conspiracy in the district court? We do not, Your Honor. We fully recognize that both in the district court and in our briefings to this court, it's been litigated on the assumption that the government had to prove both A and B, the agreement and the legal purpose of that agreement. So why wouldn't any error be invited error? I don't think it's invited error because the – and again, this would be in the court's discretion to apply postal if it wanted to. The government's happy to continue litigating. But it's not invited error in the government's view because it goes more to the framework that should be applied to a claim that has been properly raised. We cited the Kamen decision in our 28J letter, and there the Supreme Court recognized that when there's a claim that has been properly raised on appeal, a court always has the independent authority to apply what it views as the proper construction of the law. Now, the theory under Kamen would be that here if the government has properly raised on appeal a challenge to the district court's ruling that there was no conspiracy for purposes of 801D2E, if this court views the application of postal as an application of the proper construction of the requirement for proving a conspiracy, then Kamen would apply. If it doesn't apply, the government would submit that the framework would be this court's en banc decision in the United States v. Campbell, which looks at – which generally treats arguments not raised in a brief as abandoned. And it looks at – in terms of whether the court should exercise discretion to consider it, it looks at, one, was there a waiver? And if not, was there – was it argument forfeiture and are there grounds for excusing that? We don't think there's a waiver here. Yeah, can I just follow up on Judge Wilson's question? So, I mean, you did – if I – just correct me if I'm wrong about the record. I mean, the defendant suggested holding this sort of paper trial, really, and you objected to that, right? You said we don't want to do that. The government's first frontline position, Your Honor, was that it could be deferred until trial, until the evidence came in. And then the district court told you that you needed to file a motion to admit the evidence, right? And when you filed the motion, per the district court's instruction that you had to file it, the district court says you didn't make arguments about willfulness and things like that in that motion. Is that right? That's what the district court said. Right. We disagree with that. Well, I mean, I guess my point is if the district court's right about that, then it suggests that I don't think you were trying to meet some kind of criminal intent standard when you were filing the motion that the district court ordered you to file. That's correct, Your Honor. I mean, the government has acknowledged, and we've made this argument in our reply brief, that we do think we preserved a willfulness argument because we did argue that the evidence showed criminal intent, which sort of goes to willfulness. And the record shows knowledge that the LH code prosecutors knew that what they were doing, that the agreement that they entered into, was a crime. But if this court declines, you know, if it were to apply postal, I think it narrows the issues before the court. It doesn't sort of create a turnaround. It's simply the issue of whether or not the district court's finding that there was no agreement to exchange patient referrals and payments under the contract, whether that was clearly erroneous without regard to the willfulness question. So Judge Wilson mentioned United States versus the way I've been pronouncing it. That says that you have to prove three things under 801D2E, which is, one, a conspiracy existed, two, the defendant and the declarant were members of the conspiracy, and three, that the statement that you want to admit was made in the course of the conspiracy. Do you feel like you've met those three elements? We do, Your Honor. We believe our submission below satisfies those three. We do recognize that the district court based its ruling just on the first requirement, that no conspiracy was proven. So the relief we are asking for is just a reversal, a holding by this court that there was, in fact, sufficient evidence establishing the agreement, whether this court views it as, you know, whether this court applies postal or not, and then a remand for the individualized determinations as to each statement that we would like to get in under 801D2E, because the district court did not opine on these specific statements. So which findings are clearly erroneous now? The first one, and this one is in play regardless of whether this court applies postal, is the court's finding that there was no agreement here for the exchange of patient referrals by Clinica for payment under the service contracts by the tenant hospitals. The district court found, and this is at page 35 of its order, that the arrangement between Clinica and the hospitals only created, quote, an attractive arrangement, end quote, for referrals, but it did a lot more. And the three categories of evidence that the government proffered below established that that was a clearly erroneous fact finding. First, consider the fact that Tracy Cota, the former chief operating officer for Clinica, who ran Clinica along with defendant Ed Cota, she pled guilty. And in the course of doing so, she had affirmed under oath during her plea colloquy that she conspired with bank executives and others to enter into this agreement in which Clinica referred patients in exchange for payments under the service contracts. And she affirmed that the service contracts that were awarded to Clinica by the hospitals were conditioned on the referral of patients by Clinica. That's at pages 216 to 218 of Appendix B of the government's submission below. There is more than that, because the government also proffered Tracy Cota's statements to law enforcement, which detailed how the conspiracy operated. She described specific meetings and conversations with her co-conspirators, some of which were corroborated by the documentary evidence, as we've argued in our brief take. For example, her statement about the genesis of the contract between the North Fulton Hospital and Clinica, which she describes the initial meeting where Ed Cota gives defendant Holland assurances that Clinica would be referring patients. Then she describes a subsequent statement by Mr. Holland. But both Tenet and Clinica, they say, relied in good faith on attorney advice, which negates the necessary mens rea for wilfulness. And we disagree, and we think this report clearly erred in relying on advice of counsel. First, as this Court's decision in Vernon makes clear, and this, of course, now goes into the willfulness question as opposed to the existence of the agreement, but the defendant here cannot rely on advice of counsel to mitigate willfulness. Vernon requires, in order to raise advice of counsel, that there has to be evidence of a full disclosure of all relevant and material facts to the attorney who is opining. And the evidence is established now. The district court didn't even make a finding on that. It faulted the government for proving a negative. Well, advice of counsel is affirmative defense, and at a minimum, the defendants have a requirement. Before they can raise advice of counsel, there has to be support in the record of it. And you don't have it. Now, some of the evidence that we pointed to showing the lack of full disclosure is in the sealed portion of the government's brief. It is at pages 58 to 59 of the government's opening brief. But there is other evidence in the record that I can discuss here. And take, for example, an e-mail exchange, which in the government's view, in some ways, epitomizes the lack of a full disclosure to the in-house attorneys at the tenant hospitals. And in this e-mail exchange, a regional executive for a tenant, the e-mail chain, discusses whether or not to renew a Clinica contract for one of the hospitals. And the executive says, you know, this is a very rich contract at $33,000 per month. Betting on the come with volume has not proven successful. And betting on the come with volume means, you know, paying Clinica to induce patient referrals. So that's what that's a reference to. And what's interesting from an advice of counsel standpoint is earlier e-mails in the chain, in-house counsel had been copied on that exchange. Before the regional executive sends that e-mail about betting on the come with volumes, in-house counsel is removed from that e-mail. So in the government's view, that epitomizes the fact that you don't have a full disclosure to in-house counsel. And the other side, my friends on the other side, have also argued that, well, Clinica's counsel was involved in these contracts. But if you look at some of the advice that they quote in their briefs by Clinica counsel, and I think this appears, for example, at page 38 of Mr. Holland's brief, the Clinica attorney is opining on the service contracts, quote, as worded. Well, Ms. Cota made very clear in her statements to law enforcement that the contracts did not tell the whole story. And that's, for example, at page 133 of Appendix B of the government's submission. Before you run out of time, let me direct you to the district court's findings on willfulness and tell me specifically how those are clearly erroneous. Setting aside the legal arguments we've made about the heightened legal standard, they're erroneous because, one, they ignore the fact that, you know, if this court finds that there was an agreement here, there was first furtive conduct, because the agreement to pay Clinica referring patients is not set forth. Well, there's no dispute there's an agreement, right? I mean, there's clearly an agreement. It's undisputed there's an agreement. As to patient referrals, I think the other side would argue to the contrary. Okay. The government certainly believes that there was an agreement, and that agreement is not set forth in any of the service contracts, and that alone takes it out of the safe harbor provision that the defense is trying to rely on and that the district court sort of perhaps at the margins relied on as something that mitigates willfulness, because in order to invoke safe harbor protection, the contracting question has to set forth all the terms of the party's agreement. And then you layer on top of the furtive conduct the contract provisions, which require the parties to comply with the anti-kickback statute. Some of them also sort of disavow any link between payments for referrals. The district court didn't consider the contract provisions. And in the government's view, the district court gave short shrift to the evidence of compliance training that the tenant hospital executives  Can I ask one quick question, which is how long do you think this case would try, if it were to try? You're right. I think the government's best estimate is within two weeks, possibly less. And that refers to the government's presentation. Thank you. All right. You've reserved some time for rebuttal. Mr. Romano, we'll hear from Ms. Wheel on behalf of Holland. Thank you, Your Honor. May it please the Court. My name is Amy Weil, and I represent Mr. John Holland. In response to the Court's letter, as Your Honor had correctly noted, the issue was waived. And it wasn't about an error. It was both. In our case, as we had pointed out to the Court in our letter, the issue of 801 D-2E being able to rely on as a joint venture was never raised. In fact, Judge Brasher, the government was trying to meet the criminal intent standard with respect to willfulness and respect to the declarants in this case, and threw it out. Six years ago, the government submitted a letter identifying the declarants as being co-conspirators. Then in 2019 notice, the government offered the statements of the declarants under Rule 801 D-2E, quote, consistent with well-established conspiracy law. Then in 2020, in their motion to admit statements, the government argued, the evidence demonstrates by preponderance that the conspiracy charged in Count 1 of the superseding indictment existed, that each declarant was a member of that conspiracy. I mean, there's no question, but all the way along the government has been arguing for years, like six years. Well, sure. Let me just ask you a question about that.  I guess the issue that I have with the way it was presented to the district court and litigated before us that goes to this question is, you know, we have to apply the actual law. I don't think that you can sort of concede away the law that applies to a case, and it looks to me like it's pretty clear that you don't have to prove things like willfulness, disprove affirmative defenses like advice of counsel just to get your evidence. And all the cases that you're relying on before us are cases where there was a review of a jury verdict to determine, you know, whether there was sufficient evidence for a jury verdict. And here you're asking us to determine whether the government basically proved your clients are guilty just to get their evidence in. What do you say about that? Well, first of all, the government was required to prove that there was a conspiracy. Yeah, sure. We've defined a conspiracy in the United States v. Mann as an agreement, participation, and overact, right? Well, a conspiracy is more than that. Oh, okay. What is it? Fundamental proof in a conspiracy is that the defendants had entered into an agreement and you have to prove the same elements as you'd have to prove to prove a conspiracy, which includes willfulness in this case because you have to have conspired to commit the substantive offense, and that was a KS violation, which has a requirement of willfulness. So, yes, it was necessary. So the district court said this. The district court said this on page 23 of its opinion. It said, It is beyond dispute that Holland, Moore, and Cota worked together to create contractual relationships between Clinica and tenant hospitals. That's one. Two, under the terms of the contracts, tenant paid Clinica. And three, Clinica referred patients to tenant hospitals. Do you dispute any of that? What we are arguing, no, we don't. Okay. So why isn't that enough to at least meet the idea that an agreement between these people existed? And then you would move on to the next question, which is, are defendant and the clerk members of that? And then what's the statement made in the course of carrying that out? I think your assumption of your question is that the joint venture idea has been accepted in this circuit and it hasn't. Oh, well, I'm just following Wright and Miller. There's no circuit that's suggested that you have to prove criminal intent. Our circuit. Oh, okay. What case is that? Our circuit says that in order to prove a conspiracy and in order to get statements in under 801-how, 801-D2E, you have to prove the conspiracy. In our case, the government charged the conspiracy and the indictment. And I think from the tenor of your question, I think you're right. What case is that? I don't have a case, but I can go back to the court. I think from the tenor of other than how and other cases along those lines. How? So that's the one I'm saying Hughes? Okay. I think if the court is understanding and agreeing that postal is dicta and that that isn't a holding, or I can argue to the court that it could be. Well, why isn't it a holding? Well, because in postal, in a footnote, which would be rare to have a case of first impression decided in a footnote, in that case they were arguing about a logbook and whether that was admissible under 801-D2E. And that logbook was a ship's log. And it was evidence toward the criminal conspiracy of importation of drugs, of marijuana, I think, in that case. And what had happened was they had thrown, when the Coast Guard came to the boat, they saw they had thrown pieces of paper into the water. And when they went to retrieve the pieces of paper from the water, they found it was a logbook and it had in it not only the route they took, which was consistent with the drug smuggling that they were charged with, but also it had something written in it about having made contact, which was also consistent with the criminal endeavor of having made contact that they had found out had been involved in that criminal conspiracy. That was direct evidence, A. And, B, it was wrong because when the judge in the footnote, in a footnote, said that you could rely on a lawful joint venture, he cited to the Senate legislative history, but that's not what it said. It said that you didn't... It sounds like you're just arguing it was wrong. It was wrong in that it was relying on the Senate legislative history where the report didn't say that you could have non-criminal conspiracy. Well, let me ask you this. Let me ask you this. Let's just assume that we don't have to follow that precedent. And the rules of evidence apply to civil cases, too, right? Do you agree with that? Yes. Okay. So let's say that there's an employer, a white, there's a white supervisor and some white subordinates at a company, and they agree together to manufacture evidence to get a black coworker fired because of his race. Can you get their statements in under this exception to the hearsay rule in a Title VII action against the supervisor? They are able to show a conspiracy exists. Okay. Which is why it may or may not be required. Right. But you're saying they have to show a criminal conspiracy to violate the law, right? It either has to be a conspiracy with lawful means for an unlawful end or unlawful means. It has to be unlawful. You can't just have, oh, we're going to all get together and go to a movie. Our aim is to go to the movie. There's nothing criminal about it in the statements that we make and our joint venture to get to the movie or drive somewhere or to start a business or to engage in any type of activity jointly that there's a goal. So you're saying it doesn't have to be criminal, it has to be unlawful, so it has to violate the law in a civil way. No, it has to violate the law, be unlawful. It can be introduced in a civil case, but the whole underpinning of it. So it has to be criminal. Correct. Oh, so they couldn't be introduced then because conspiring to fire someone because of their race is not criminal. If it were, like for example. Yeah, if the law were different. But in my hypothetical, you're saying you wouldn't be able to introduce it. Not if the law were different. But for example, if there's. . . No, if the law is the way it is now, you're saying it would not be introducible, right? Because it's not a crime to conspire to fire someone because of their race. If it were against the law, if they used unlawful means to reach a lawful end, it has to be criminal. Okay. And the reason we believe that. . . So in the patent action then that sues one of those people, you wouldn't be able to get the statements in under this either, right? If it were criminal. Yeah, it has to be criminal. So, okay. All right. And it can be put in a civil case. Where do you get that from? Where's that idea? Well, from Black's Law Dictionary, which defines conspiracy to be a confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful or criminal act. I mean, that's what the word conspiracy means. Plus, it's consistent with what the Supreme Court stated in a footnote in Anderson v. United States 417 U.S. 211, note 6, where the Supreme Court said the rationale for both the hearsay conspiracy exception and its limitations is the notion that conspirators are partners in crime. And we admit that's dicta in that case, but as this Court has very famously observed, there is dicta and there is dicta and there is dicta. Yeah, but isn't the key part of that, though, that they're partners? Isn't that the issue? Because all of these exceptions under this hearsay, under this part of the hearsay rule, are about being responsible for your own statements, right? And the idea is that if you're my partner and you make a statement, then that statement can be used against you as long as it's part of our joint effort. If you're going under the agency rule, Section D, whatever, that's what that is. This is the co-conspirator section, and this is a conspiracy exception, and it presupposes a conspiracy. So that is why the Supreme Court in every single case, if you look at it in this circuit, talking about admitting 801 D2E statements, they're all criminal conspiracies. They don't rely just on some amorphous joint venture. And I would cite the court to, and I have no time to get to it, our submission along with our letter, which explains in great detail why it should not be a lawful joint venture. It has to be a criminal. And, Your Honor, could I get some extra time to argue the issue in the case? Well, I'll give you two more minutes. In addition to, I'll give you two more minutes. Well, thank you, Your Honor. I would like to point out just that to put this case in context and to crystallize what's going on, the indictment in this case charges a massive $400 million years-long anti-kickback conspiracy involving 55, according to the government, unindicted co-conspirators. Yet the government just said it's going to take two weeks to try. Why is that? Because the government wants to prove a bulk of its case at trial by having a case agent read snippets of emails, 44 emails, to the jury in order to prove and make an inference that the people who read those statements, who entered those emails, were co-conspirators in an AKS conspiracy and that that was proof toward the conspiracy itself. And the government wants to argue that inference knowing full well that there is grand jury testimony and other statements of these declarants and that those declarants, if they testified at trial, would say, oh, wait a second, yeah, I was talking about volume. We do that. That's what I do. It's part of my job. I talk about volume because it's important to what I do in my job. Plus, those same witnesses, if they were called to testify at trial,  because they were vetted by lawyers. And, Your Honor, I point out that there was a full disclosure. There was a full disclosure. In fact, when the judge issued her opinion, she said on page 37 of her order that the government's evidence falls significantly short of establishing that the employees failed to make a full and complete good faith report of all material facts. A, so she talked about the disclosure in there. Plus, she cited the correct law, the Petrie case and all the other cases that she knew what the law was about. You have to make a full disclosure. That's pretty basic too. Can I ask you a question about, to me it just seems on this issue, the government's best argument is that they have this co-conspirator who has pled guilty and is willing to testify. What do you say about that? Your Honor, first of all, the judge, the district court judge took the plea. I know, which is shocking to me that she said, I'm allowing you to plead guilty to a conspiracy and then later I'm saying one didn't exist. But go ahead. Keep in mind also it didn't just involve North Fulton and our client. She pled guilty to way down the trail and I think all the way to 2008, 9 and 10, other agreements that might have with other hospitals been a little more suspect. Our agreement was not, first of all. Second of all, we have plenty of information in the record to support that our contracts with North Fulton, and that's my client, Mr. Holland, that the contracts with North Fulton were for valuable services. These same declarants, if they were called to testify, would testify that these were valuable services. They had, for example, translation services that President Clinton, the year before the contract was entered, said you need to get translators in these hospitals. And they knew they needed to too because they were having mothers show up in the hospitals who didn't speak English, who had no prenatal care, and they would show up and a doctor would go, oh, my God, you're pregnant. It looks like I don't know how many babies you're going to have. And there were all kinds of risks involved. And then after they would put up with all the risks, the child would go to neonatal unit, possibly, and then the hospital wouldn't get paid because these undocumented mothers would be in the wind. So, yes, they entered into these agreements that were terrific agreements, according to everybody who looked at them, all the lawyers. And this is just, I actually just don't know this. I mean, so specifically with your client, what is the co-conspirator? I think it's COTA that pled guilty. What would her testimony be? What's the proposed testimony? It's hard to know exactly what she would say at this point, knowing how this litigation has transpired. Why do you say that? I don't understand. Because the litigation has transpired in a way where we now have the court saying, I've looked at your plea. I've looked at all the evidence. I've seen these contracts. I've reviewed them. The judge spent two years considering this motion and how to rule on this motion. And the judge said, at the end of the day, I've seen it all. And I've seen the lawyers. And it looks to me like there's no conspiracy. I'm sure if she read that and testified today, we don't know what she would say. But if she even testified consistent with what she said before, nothing that she says makes our client guilty of an AKS violation. Because if she thought these contracts were all about referrals, maybe they were to her, but they certainly weren't to the hospital. And the hospital knew everything. I mean, this whole argument that they have been making all along, that these referrals, the fact that there were referrals, somehow shows an AKS violation. The hospital knew that this was a referral source because that's how they were able to determine how many translators they needed. I mean, it's like not a hidden idea. There's no smoke and mirrors here. Everybody knew what was going on. The translators were needed because they expected and hoped to get, just as the law allows, these patients were going to come to the hospital and they're going to need the services. They already had patients. I believe the record shows they had about 200 a year Hispanic undocumented mothers coming in for deliveries. Well, we let you go way over. Thank you. I appreciate that and ask the court to affirm. All right. Thank you. And Mr. McAvoy, you're here on behalf of Moore. Yes, Your Honor. May I please report? My name is Brian McAvoy and I'm here on behalf of Appellee William Moore who's here in the courtroom today. And I want to circle back on some of the points raised by the court to confirm that the decision by the lower court should be affirmed and was well-reasoned under any standard that this court applies. But taking a step back, it was the government that framed this issue. And it was the government in seeking to admit this code of superior hearsay through 801D2E said to the court, whereas here an objective of the charge conspiracy is to violate the AKS, the United States must demonstrate that the unlawful agreement involved offering to pay, solicit, or receive remuneration, including any kickback or bribe, to induce referrals of items or services. And then in its appellate brief in page 36, the government says the elements of paying an unlawful health care kickback are that defendant knowingly and willfully offered or paid remuneration to induce a person to refer services for which payment may be made by a federal health care program. And now I understand the court's question about this joint venture theory of liability, but the government stands up and the first thing it says that an agreement need not be criminal in nature. And I understand that according to some cases, an agreement may not be criminal in nature. But the agreement in this case, according to the government, is criminal in nature. There is not some other non-criminal agreement that's been argued by the government in the indictment at the district court on appeal. So for the first time today, we're hearing about some potential non-criminal agreement. This is the only question I'm going to ask you about this. I'm curious what you say about the district court's statement here that is beyond dispute that one, Holland, Moore, and Cota worked together to create contractual relationships between Clinica and Tenet Hospitals. Two, under the terms of the contracts, Tenet paid Clinica. And three, Clinica referred patients to Tenet Hospitals. Is that beyond dispute from your perspective? Well, the second sentence is instructive. In attempting to show that this relationship constituted a Is that beyond dispute from your perspective? Do you dispute that? They worked to create a contract. Okay. And if you look at the case that's cited by the court in its notice on this joint venture theory of liability, a couple of things occur to me. Specifically in Layton, the court held that any common enterprise must be factually intertwined to the charged conspiracy. In that case, you had a charged conspiracy. You had an 801 D2E notice, which was slightly different than the charged conspiracy. And the long answer is it's got to be factually intertwined with what's charged in the conspiracy. Here we don't have any of that. We've got an indictment. We've got an 801 D2E notice, which marries up the indictment. And now here we have some—I would love to hear the government stand up and say what the non-criminal agreement is that meets the standard because under all of these joint venture cases that Your Honor referred to, they apply principles of common law agency and contract. And I would draw the court's attention to Fair Home Funds, Inc., versus Federal Housing Financial Agency, which is 636 F. Sup. 3rd at 144. It's a District of D.C. case authored by Judge Royce Lamberth. And to Your Honor's question, that was a civil case. And the court held that parties on opposite sides of a contract, as we have here, cannot constitute a joint venture. As Your Honor said, they've got to be partners. We weren't partners with Ed Cota. We weren't partners with Tracy Cota. The fact that we're on opposite sides of the contract, it negates their ability to try to shoehorn this later argument into 801 D2E. They haven't said anything about it. I assume that's what they're going to say. But the court specifically in that case said, lawful joint venture cases plaintiff's site involve parties on the same side of an enterprise or business relationship, not counterparties to a contract. The circuit has explained that its extension of the co-conspirator exception to lawful joint ventures is based on concepts of agency and partnership law. Agreeing to a contract is not the same thing as entering an agency or partnership relationship and would make little sense to extend the rule further to any statements made by a party's contractual counterparty made in furtherance of negotiating a contract. That's what we have here. But according to the government, we have an unlawful agreement. The government at all times has said for purposes of 801 D2E, the above evidence demonstrates by preponderance that a conspiracy to violate the AKS existed between defendants, Ms. Cota and others. Accordingly, the United States has satisfied the first element of admission. What do you say about what I was going to ask your co-counsel there? What do you say about the fact that one of the co-conspirators pled guilty? I mean, it just seems so strange to say I'm going to let you plead guilty to a conspiracy and then say the conspiracy doesn't exist. It is strange. If you look at the record, Tracy Cota was interviewed 19 times by the FBI. In one of her first interviews in 2012, she was asked, when asked if any of the hospitals paid or gave incentives for Clinica clinics to direct Clinica clients to a specific hospital, answer no. Okay? That's after the conduct ended. Years later, in 2014, she quote says, she now sees it differently. Okay? So through the course of meeting with FBI agents 19 times, she now sees it differently. Well, that's news to all the alleged co-conspirators that she was dealing with dating back to 1999. At the time, she didn't have the intent. And that's what the court focused on in this case. Whether you say it's willfulness or the acknowledgment of doing something unlawful, they failed to meet their burden. I see I'm out of time. May I, Judge Wilson? Could you address Judge Brasher's point that it would not be proper to consider the affirmative defense of safe harbor in answering this question? So whether it's safe harbor or who's based reliance on advice of counsel defense, the district court did not flip the burden. The district court merely acknowledged that there are defenses. And specifically as it relates to good faith reliance on advice of counsel defense, the first two words of that are what are most important. Because in the 11th Circuit, in addition to the affirmative defense of good faith reliance on advice of counsel, we have the defense of good faith. And what the court held here is that these contracts were reviewed inside and outside by clinical lawyers, by tenant lawyers, inside tenant lawyers, outside tenant lawyers. And if you look at the record, it's replete with individuals like mine relying on those lawyers to make sure that a very complicated area of the law was being followed. Yeah, I guess just to follow up on that, I mean, I guess my concern is that we're sort of having a trial on the papers before the actual trial, right, where the government presents its evidence of a conspiracy, then you raise defenses, then the district court rules on whether your defenses are valid. It just seems like such a strange proceeding. I mean, do you have any comment on just whether, I mean, is this the way we should always do it in conspiracy cases? No, the way you should always do it is call the witnesses. That's the way you should always do it. So this was on the papers and it should have been like a bench trial is what you're suggesting. The James, the United States Supreme Court in the United States versus James has created a regime where you have a James hearing. Right. Well, guess who asked for a James hearing? The defendants. Guess who opposed the James hearing? The government. And so it's difficult for me, for the government now, to walk in with some You're going to have to stay at the microphone so we can record your comments. Yes, Your Honor. They come with an alternative theory of admissibility and complain that these issues were not fully vetted in the lower court when it was the defendants that asked that they be. Well, I guess my point is just it's odd to me that you're raising affirmative defenses to a conspiracy charge as a response to a motion to admit evidence. I mean, the affirmative defenses go to ultimate liability of the conspiracy charge. Is it always? So in the normal case, for example, right, in the normal case that we have, it's not this complicated. It's a case where there's a bunch of people selling drugs and you want to get co-conspirator testimony in and the government is going to have to show that they generally agreed to sell the drugs. I mean, would we have to have a James hearing where the defendant then gets to raise affirmative defenses and lack of knowledge and things like that as part of the James hearing? Is that the way it's supposed to go? The difference between a blue-collar and a white-collar case, in a drug case, everyone agrees that a crime was committed. The question is whether the defendant did it. In a case like this, everyone agrees we entered into these contracts. The question is was there a crime committed? We say no. It's the government's obligation at this stage to prove by a preponderance of the evidence that an unlawful agreement occurred and they failed to do so. Okay. Thank you. Thank you, Mr. McAvoy. And Mr. Romano, you have reserved some time for rebuttal. Thank you, Your Honor. Just a few brief points. I don't want to spend much time on Postal. It's obviously this Court's prerogative to determine whether or not that is law of the circuit or not and whether or not the Court should apply it. But if this Court were in its discretion to apply Postal, I'd just like to respond to the suggestion that we're introducing some alternative theory. All that means is that the same agreement that has been alleged here, that is still under consideration. The scope of the agreement doesn't change. It's patient referrals in exchange for payments under the service contracts. This Court applies Postal. It just means it doesn't take the additional step of deciding whether or not that agreement at this stage, for purposes of Rule 801 D2E, violates the anti-kickback statute. Two, I'd like to go back to Judge Brasher's questioning about the import of the significance of Tracy Cota's guilty plea. The government does believe that it is a significant piece of evidence showing that, in fact, there was an agreement and one that was unlawful to exchange patient referrals for payments under the service contract. And it wasn't just the plea agreement itself. And, by the way, the district court also accepted the guilty pleas to the same conspiracy of Atlanta Medical Center as an entity, as well as the guilty plea of North Fulton. But going back to Tracy Cota's statements, they were corroborated by the documentary evidence in this case, internal documents from Tennant Hospital, internal e-mail communications, which are spelled out in our briefing, but consider a few examples. In 2002, Defendant Moore, who hasn't long been CEO for Atlanta Medical Center, e-mails Defendant Holland and is asked, how is clinical working out for you? And what's his next question? Not what is the quality of their translations. Do they do good Medicaid eligibility determinations? That's the services under the contract. It's how many deliveries are they averaging a month? So that's the litmus test for valuing Clinica and what Clinica could do for Tennant Hospitals. It's patient referrals. Consider an e-mail that's sent by a hospital executive around 2009, and the executive is complaining about being held hostage by Clinica. And she writes, if we think we can get Clinica to send us the business and we can get the translation services elsewhere, I'm all for it. I agree with your assessment of the way they hold us hostage and don't like it. That's pretty explicit in explaining why the hospitals are entering into these arrangements with Clinica. Consider a 2011 e-mail that Defendant Moore sent, and this is after Defendant Ed Cota and Tracy Cota have separated. Now there are two different clinics. And Defendant Moore writes, see significant number of babies coming from Ed Cota's clinic. We need to move on that agreement or risk him pressuring the doctorage to deliver at another hospital. That's, again, very explicit. These contracts were not above board. Tracy Cota explained that they were a pretext for paying Clinica to refer patients to the hospitals. She explained that ordinarily Clinica didn't provide translation services. It did translations in-house at its own clinic, but it didn't contract out for that. She explained that at least one hospital, Lantau Medical Center, usually paid the monthly maximum for translations, even regardless of the amount of translation services that were provided. I see that my time has expired. I would just say that the documentary evidence corroborates Tracy Cota's factual omissions during her guilty plea and her expected testimony at trial. Thank you very much. All right. Thank you, Mr. Romano. Thank you, counsel.